**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| GERI LYNN EVANS, | ) | NO. CV 14-3755-E |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| CAROLYN W. COLVIN, | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| Defendant. | ) | |

**PROCEEDINGS**

Plaintiff filed a complaint on May 15, 2014, seeking review of the Commissioner's denial of benefits.  The parties consented to proceed before a United States Magistrate Judge on November 3, 2014. Plaintiff filed a motion for summary judgment on November 6, 2014. Defendant filed a motion for summary judgment on January 22, 2015. The Court has taken the motions under submission without oral argument.  See L.R. 7-15; "Order," filed May 28, 2014.

///

///

**BACKGROUND**

Plaintiff asserted disability since September 1, 2007,[1] based on alleged problems with her back, neck, arms, hands, heart, and right leg (Administrative Record ("A.R.") 44, 194-96, 214). Plaintiff also alleged that, as of March 2011, her neck condition worsened, causing her hands and arms to become numb, and she assertedly began experiencing headaches, anxiety, and depression (A.R. 257). An Administrative Law Judge ("ALJ") examined the medical record and heard testimony from Plaintiff and a vocational expert (A.R. 19-760).

In a decision dated December 14, 2012, the ALJ found that Plaintiff has the following severe impairments: "status post right L5-S1 hemilaminotomy September 2007; status post C4-5, C5-6 discectomy, and fusion April 2008; osteopenia; and remote angioplasty history 2001" (A.R. 24). The ALJ found Plaintiff's alleged depression and polysubstance abuse nonsevere (A.R. 25). The ALJ determined that Plaintiff retains the residual functional capacity for light work with: (1) occasional overhead reaching; (2) no constant fine or gross manipulation; (3) no power gripping, grasping, or torquing bilaterally; (4) frequent climbing, balancing, kneeling, and crawling, and (5) occasional climbing ladders, stooping, and crouching (A.R. 28). The ALJ discounted the contrary opinions of treating physician

---

[1]     Plaintiff asserted disability beginning in 2007 notwithstanding the fact that her 2009 application for disability benefits previously had been denied in 2009 (A.R. 22). The denial of the prior application, which became final long before the filing of the present application, was not reopened in the present case. <u>Id.</u>

2

Dr. Benjamin Lish (A.R. 26-33).  The ALJ also discounted Plaintiff's testimony and certain lay witness evidence (A.R. 26-30).

The ALJ adopted the testimony of the vocational expert in concluding that a person having the limitations the ALJ found to exist could perform Plaintiff's past relevant work as an administrative clerk and billing clerk and, alternatively, could perform light, unskilled work as a parking attendant or storage facility rental clerk – jobs existing in significant numbers in the national economy (A.R. 33-35).

The Appeals Council considered additional treatment records from Dr. Lish, but denied review (A.R. 1-6, 761-70).

**STANDARD OF REVIEW**

Under 42 U.S.C. section 405(g), this Court reviews the Administration's decision to determine if: (1) the Administration's findings are supported by substantial evidence; and (2) the Administration used correct legal standards.  See Carmickle v. Commissioner, 533 F.3d 1155, 1159 (9th Cir. 2008); Hoopai v. Astrue, 499 F.3d 1071, 1074 (9th Cir. 2007); see also Brewes v. Commissioner, 682 F.3d 1157, 1161 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation and quotations omitted); see also Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006).

1    If the evidence can support either outcome, the court may
2    not substitute its judgment for that of the ALJ.  But the
3    Commissioner's decision cannot be affirmed simply by
4    isolating a specific quantum of supporting evidence.
5    Rather, a court must consider the record as a whole,
6    weighing both evidence that supports and evidence that
7    detracts from the [administrative] conclusion.

8

9  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and
10 quotations omitted).

11

12    Where, as here, the Appeals Council considered additional
13 evidence but denied review, the additional evidence becomes part of
14 the record for purposes of the Court's analysis.  See Brewes v.
15 Commissioner, 682 F.3d at 1163 ("[W]hen the Appeals Council considers
16 new evidence in deciding whether to review a decision of the ALJ, that
17 evidence becomes part of the administrative record, which the district
18 court must consider when reviewing the Commissioner's final decision
19 for substantial evidence"; expressly adopting Ramirez v. Shalala, 8
20 F.3d 1449, 1452 (9th Cir. 1993)); Taylor v. Commissioner, 659 F.3d
21 1228, 1231 (2011) (courts may consider evidence presented for the
22 first time to the Appeals Council "to determine whether, in light of
23 the record as a whole, the ALJ's decision was supported by substantial
24 evidence and was free of legal error"); Penny v. Sullivan, 2 F.3d 953,
25 957 n.7 (9th Cir. 1993) ("the Appeals Council considered this
26 information and it became part of the record we are required to review
27 as a whole"); see generally 20 C.F.R. §§ 404.970(b), 416.1470(b).
28 ///

4

**DISCUSSION**

After consideration of the record as a whole, Defendant's motion is granted and Plaintiff's motion is denied.  The Administration's findings are supported by substantial evidence and are free from material[2] legal error.

I.   **Summary of the Medical Record**

A.   **Treating Source Records**

Dr. Moustapha Abou-Samra performed spinal surgeries on Plaintiff. See A.R. 294-340.  On September 4, 2007, Dr. Abou-Samra performed a right-sided L5-S1 microdiskectomy (A.R. 333-34, 338-39; see also A.R. 337 (operative lumbar spine x-ray)).[3]  On April 8, 2008, Dr. Abou-Samra performed an anterior cervical microdiskectomy and interbody fusion at C4-5 and C5-6 (A.R. 302, 306-13, 323-24).  On August 3, 2008, Dr. Abou-Samra released Plaintiff to return to work, without any restrictions (A.R. 294).

---

[2]   The harmless error rule applies to the review of administrative decisions regarding disability.  See Garcia v. Commissioner, 768 F.3d 925, 932-33 (9th Cir. 2014); McLeod v. Astrue, 640 F.3d 881, 886-88 (9th Cir. 2011); Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

[3]   A post-surgical MRI of Plaintiff's lumbar spine from June 24, 2008, showed no significant findings other than a persistent, mild, inferior bilateral neuroforaminal narrowing in the inferior recesses of L5-S1, bilaterally, unchanged from a prior exam (A.R. 296-97; compare A.R. 332 (November 7, 2007 lumbar spine MRI), A.R. 340 (July 17, 2007 pre-operative lumbar spine MRI)).

The record reflects a long history of drug seeking behavior by Plaintiff.  Dr. Abou-Samra prescribed Vicodin from November 2006 through February 2007, and again on October 29, 2007 (A.R. 433-34). On November 1, 2007, Plaintiff sought additional pain medication from Dr. Abou-Samra (A.R. 335).  Dr. Abou-Samra previously "tentatively" had prescribed Vicodin, but then provided Dilaudid (also a narcotic pain reliever) "for the time being" because Plaintiff claimed Vicodin caused her stomach problems (A.R. 335).  Yet, on November 12, 2007, Plaintiff presented to the emergency room with complaints of back pain for which she was prescribed Vicodin (A.R. 330).  And, on November 16, 2007, Dr. Abou-Samra renewed Plaintiff's Vicodin prescription, but declined to renew Plaintiff's Dilaudid prescription because Plaintiff reportedly took too much (A.R. 331).  Dr. Abou-Samra recommended that Plaintiff's pain be managed with physical therapy (A.R. 331).  On December 17, 2007, Dr. Abou-Samra noted that Plaintiff was taking too much narcotic medication and that he had explained very clearly that he was trying to taper off Plaintiff's Dilaudid altogether (A.R. 327).[4]

Meanwhile, in September of 2007, Plaintiff began seeing Dr. Merrill Bacon, who initially prescribed Dilaudid (A.R. 347-421).  On November 19, 2007 (only a week after Plaintiff's emergency room visit for which she was prescribed Vicodin (A.R. 330)), Dr. Bacon again prescribed Dilaudid (A.R. 402-03).  During the course of Plaintiff's treatment with Dr. Bacon, which ended on or around August 21, 2008, Dr. Bacon prescribed Dilaudid, Roxicodone, Methadone and Norco.  See

_____

[4]    At physical therapy in November - December of 2007, Plaintiff was observed to be "heavily medicated" (A.R. 329).

A.R. 405-06 (November 27, 2007 Dilaudid prescription and treatment note); A.R. 402-03 (December 12, 2007 Dilaudid prescription and treatment note); A.R. 400-01 (January 2, 2008 Dalaudid prescription and treatment note); A.R. 398-99 (January 9, 2008 Norco prescription and treatment note); A.R. 395-96 (January 18, 2008 Norco prescription and treatment note); A.R. 389-90 (February 6, 2008 Dilaudid prescription and treatment note); A.R. 385-86 (February 25, 2008 Norco prescription and treatment note); A.R. 384 (March 11, 2008 Methadone prescription); A.R. 381-82 (March 24, 2008 Methadone prescription and treatment note); A.R. 377-78 (April 17, 2008 Dilaudid prescription and treatment note); A.R. 375-76 (April 30, 2008 Dilaudid prescription and treatment note); A.R. 372-73 (May 7, 2008 Dilaudid prescription and treatment note); A.R. 356-57 (July 16, 2008 Roxicodone prescription); and A.R. 354-55 (August 6, 2008 Dilaudid prescription and treatment note).

On several occasions, Plaintiff requested early prescription refills.  On December 7, 2007, Plaintiff called Dr. Bacon to request more pain medication, claiming that she had to double what she was taking because of supposedly increased pain from physical therapy (A.R. 404).  On January 14, 2008, Plaintiff called Dr. Bacon to request a prescription for Vicodin, claiming that her purse containing all of her Norco and Dilaudid had been stolen (A.R. 397).  Dr. Bacon required a police report, which Plaintiff said she did not want to file (A.R. 397).  On January 28, 2008, Dr. Bacon denied a refill request for Hydrocodone, indicating that Plaintiff had Dilaudid (A.R. 388).  On February 18, 2008, Plaintiff asked for Vicodin, claiming that she had washed her Dilaudid down the garbage disposal because the

Dilaudid supposedly made her "too sleepy" (A.R. 387).  On March 17, 2008, Plaintiff reported that she was taking too much Methadone, she "like[d] it too much," and wanted to go back to Vicodin (A.R. 383). Plaintiff was taking more Methadone than allowed.  See A.R. 380.

On March 7, 2008, Plaintiff had returned to Dr. Abou-Samra, reporting she was taking a combination of Vicodin and Dilaudid and seeking refills because Dr. Bacon purportedly was unable to see Plaintiff that week (A.R. 323).  Dr. Abou-Samra agreed to refill the medications temporarily (A.R. 323).

On April 18, 2008, Plaintiff also saw Dr. Eric Birdwell for evaluation of alleged hip pain, requesting Dilaudid (A.R. 640-41). Dr. Birdwell refused (A.R. 641).

Plaintiff went to the emergency room on May 19, 2008, complaining of neck pain after an alleged fall (A.R. 298-99).  An x-ray of her cervical spine was normal (A.R. 299; see also A.R. 301 (May 9, 2008 normal cervical spine x-ray), A.R. 304-05 (April 8, 2008 intra- and post-operative cervical spine x-rays); A.R. 325 (March 7, 2008 pre-operative cervical spine MRI)).  Plaintiff was given Dilaudid, together with warnings concerning narcotic medications (A.R. 299).

Beginning on May 28, 2008, Dr. Bacon prescribed Suboxone for Plaintiff, which is used to treat opiate addiction (A.R. 351, 354, 362, 366-70).  See www.suboxone.com (last visited March 2, 2015). Plaintiff had informed Dr. Bacon that she had taken all of her Dilaudid (A.R. 371).  She previously had requested an early Dilaudid

refill on May 5, 2008 (A.R. 374).  On June 18, 2008, Plaintiff's husband reported that Plaintiff had taken Suboxone, Vicodin, and Xanax (A.R. 366).  Dr. Bacon's notes indicate that Plaintiff was aware she should not take other medications with Suboxone and that Plaintiff would have to wait for the side effects to wear off (A.R. 366).  By August 21, 2008, Plaintiff reportedly had been taking six to eight Suboxone per day and wanted more, but Dr. Bacon made Plaintiff wait for the next refill (A.R. 352).

It appears that Plaintiff then changed doctors.  The Administrative Record contains treatment records from Dr. William Davis from September 9, 2008 through August 29, 2009 (A.R. 446-82). Plaintiff sought medical clearance to return to an outpatient drug rehabilitation program after a nurse in the program noted that Plaintiff had swelling in her legs and feet and that Plaintiff allegedly had fallen when Plaintiff stood up (A.R. 480-81).  Upon reporting that Plaintiff was slurring her words, Dr. Davis ordered a drug abuse screening (A.R. 481-82).  Plaintiff then was taking Suboxone, and Dr. Davis wanted Plaintiff to wean off of that drug (A.R. 481-82).  Plaintiff's gait and coordination were normal, as well as her mood, memory, affect, and judgment (A.R. 481).

Plaintiff returned on September 19, 2008, with her swelling resolved (A.R. 479).  She asked for an injection of Toradol and a prescription for Tramadol for alleged back pain, which Dr. Davis ordered with a note "[n]o further narcotics for her back pain" (A.R. 479-80).  Plaintiff reportedly was nervous or anxious (A.R. 479).  Her gait and coordination were normal (A.R. 479). Dr. Davis released

Plaintiff to return to the rehabilitation program (A.R. 480).

Plaintiff saw another doctor at Dr. Davis's medical office on October 8, 2008, requesting a Toradol shot and more Tramadol for alleged low back pain, which that doctor ordered (A.R. 476-78). Plaintiff returned two days later with complaints of shoulder pain for which she was given a muscle relaxant (A.R. 475-76).[5]

On October 18, 2008, Plaintiff complained of pain from dental work the week before and back pain supposedly caused by her niece "jumping on her back" (A.R. 474). When Plaintiff reported relief after taking Vicodin, the attending doctor discussed the use of opiates with Plaintiff (A.R. 474). Plaintiff was given a Toradol injection and a Tramadol prescription (A.R. 475). She had normal reflexes and her mood and affect were normal (A.R. 474).

On October 28, 2008, Plaintiff complained of low back pain without radiation (A.R. 470). Plaintiff denied receiving relief from Tramadol (A.R. 470). Plaintiff had a positive straight leg raising test (A.R. 471). Plaintiff was given a Toradol injection and prescribed hydrocodone-acetaminophen (Vicodin or Norco) for her alleged pain (A.R. 471).

---

[5]   Plaintiff had one physical therapy appointment on October 10, 2008, but did not return for further therapy (A.R. 446-51).  Evaluation notes from the visit indicate that Plaintiff complained of chronic low back pain supposedly aggravated by vacuuming, standing or walking more than 20 minutes, and rolling over in bed (A.R. 448).  On examination, Plaintiff reportedly had soft tissue and joint dysfunction, pelvic asymmetry, and decreased trunk range of motion and strength (A.R. 449-50).

1   Plaintiff returned on October 29, 2008, complaining of back and
2   tooth pain (A.R. 471).  Once again, Plaintiff was given an Toradol
3   injection and prescribed Tramadol (A.R. 473).

4

5   On October 30, 2008, Plaintiff saw Dr. Davis for follow up from a
6   recent syncope episode (A.R. 468).  Plaintiff claimed she re-injured
7   her low back while on vacation (A.R. 468).  Dr. Davis refused to order
8   pain relievers (A.R. 469).

9

10  Plaintiff visited a Dr. Braganza on November 15, 2008,
11  complaining of tooth and low back pain and requesting a Toradol shot
12  and a pain medication refill (A.R. 466).  Dr. Braganza authorized a
13  Toradol shot but advised Plaintiff to follow up with her primary care
14  physician for a refill on her pain medications, given Plaintiff's
15  history of "opioid dependence" (A.R. 467-68).

16

17  Plaintiff returned to Dr. Davis on December 1, 2008, for a
18  regular physical examination (A.R. 462-63).  She reported being off
19  Lexapro and being okay "mood wise," but claimed lower back pain
20  radiating to her right leg (A.R. 463).  On examination, she was
21  observed to be depressed and nervous/anxious (A.R. 464).  Dr. Davis
22  diagnosed, inter alia, depression, major, recurrent, panic disorder,
23  cervical disc disease, lumbar radiculopathy, and chronic low back pain
24  (A.R. 465).  Dr. Davis prescribed no pain relievers, however (A.R.
25  465-66).

26

27  Plaintiff returned on December 5, 2008, again complaining of
28  right radicular low back pain (A.R. 460).  A Dr. Stephenson noted that

Plaintiff had a history of Vicodin abuse and that Plaintiff abuses
narcotics "to the point of being intoxicated and falling" (A.R. 460).
Dr. Stephenson indicated that Plaintiff needed a non-narcotic, non-
pharmacologic treatment for her alleged pain (A.R. 460).  Plaintiff
reportedly planned to re-enter a detoxification program because she
did not complete her prior treatment for opioid abuse (A.R. 460).  Dr.
Stephenson reviewed a recent MRI and noted a positive right side
straight leg raising test, spasm, and tenderness, with mild diminished
right S1 pattern sensation (A.R. 460-61).  Per Dr. Stephenson's
discussion with Dr. Davis prior to Plaintiff's visit, the plan was to
avoid prescribing pain medications, given Plaintiff's planned
addiction treatment (A.R. 462).  The doctor ordered a right S1 TFESI
(Transforaminal Epidural Steroid Injection) (A.R. 462).

Plaintiff returned to Dr. Davis on December 17, 2008, "for follow
up of disability which ended 2 weeks ago" (A.R. 458).  Plaintiff
reported that she was on disability to deal with opioid addiction but
she reportedly was unable to finish treatment (A.R. 458).  Plaintiff
claimed she could not return to work because of her "chronic pain
issue," even if she had no substance abuse problems (A.R. 458).  She
claimed that she was unable to sit very long due to her "back and leg
pain" (A.R. 458).  She had been off Lexapro for a month and reportedly
was doing well "mood wise" (A.R. 458).  Dr. Davis indicated that
Plaintiff was "negative" for depression and that Plaintiff was "clean
now" (A.R. 458).  Dr. Davis did not prescribe a pain reliever, but did
refer Plaintiff to Behavioral Health to rearrange an outpatient
treatment program and also referred her "to Dr. D. Armstrong for
suboxone" (A.R. 459).

1    Plaintiff returned to Dr. Davis on February 9, 2009, claiming
2  there was "no way she can return to work because of the severity of
3  her chronic low back pain" (A.R. 455-56).  She reportedly was back on
4  Norco, from her dentist and from a Dr. Armstrong, and she wanted a
5  refill (A.R. 456).  Plaintiff also wanted a Lexapro refill (A.R. 456).
6  Dr. Davis refilled Plaintiff's Lexapro and ordered ibuprofen for her
7  alleged pain (A.R. 457).  Dr. Davis extended Plaintiff's temporary
8  disability to April 6, 2009, "[b]ecause of chronic low back pain"
9  (A.R. 457).

10

11    Plaintiff returned to Dr. Davis on April 22, 2009 (A.R. 453-54).
12  Despite his earlier plan to avoid prescribing narcotics, Dr. Davis
13  prescribed hydrocodone-acetaminophen and extended Plaintiff's
14  disability to July 6, 2009 (A.R. 455).

15

16    Plaintiff saw a Dr. Sanders on August 29, 2009, complaining of
17  low back pain (A.R. 452).  Plaintiff again was prescribed hydrocodone-
18  acetaminophen (A.R. 453).

19

20    Plaintiff then underwent a single week of drug rehabilitation at
21  Vista Del Mar Hospital (A.R. 567-71).[6]  On admission on September 2,
22  2009, Plaintiff reported that she was using "up to 70 Norco a day" and
23  was "increasingly depressed" (A.R. 567).  She was diagnosed with
24  "major depression, recurrent, severe," and "polydrug abuse," and it
25  was noted to rule out borderline personality disorder (A.R. 567).

26

27       [6]    Plaintiff had been to a rehabilitation program at Vista
    Del Mar Hospital once before, but had left the program after only
28  one day (A.R. 570).

13

Plaintiff was assigned a Global Assessment of Functioning ("GAF")
score of 30 (A.R. 567).[7]  Plaintiff was put on an opiate detox
protocol in which she was given one dose of Suboxone, then switched to
Abilify "to augment the Cymbalta" (A.R. 567).  She was discharged to
aftercare through Vista Del Mar partial hospitalization on
September 8, 2009, stable with a GAF of 40 (A.R. 568).  She was
instructed to use "[n]o drugs of abuse including narcotics and
benzodiazepines" (A.R. 568).

        Thereafter, Plaintiff began seeing Dr. Benjamin Lish.  The
Administrative Record contains monthly treatment records from Dr. Lish
from March 2010 through January 2013 (A.R. 554-59, 625-33, 674-770).
On March 8, 2010, Plaintiff reported having been in a motor vehicle
accident in September 2009 (A.R. 633).  Since the accident, Plaintiff
assertedly had pain radiating down her right buttock to her right knee
(A.R. 633).  She reported taking four Norco per day for alleged pain
(A.R. 633).  On examination, Plaintiff had positive straight leg

---

[7]     Clinicians use the GAF scale to rate "psychological,
social, and occupational functioning on a hypothetical continuum
of mental health-illness."  American Psychiatric Association,
Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed.
TR 2000) ("DSM").  A GAF score of 31-40 indicates "[s]ome
impairment in reality testing or communication (e.g., speech is
at times illogical, obscure, or irrelevant) OR major impairment
in several areas, such as work or school, family relations,
judgment, thinking, or mood (e.g., depressed man avoids friends,
neglects family, and is unable to work; child frequently beats up
younger children, is defiant at home, and is failing at school)."
Id.  A GAF score of 21-30 indicates that "[b]ehavior is
considerably influenced by delusions or hallucinations OR serious
impairment in communication or judgment (e.g., sometimes
incoherent, acts grossly inappropriately, suicidal preoccupation)
OR inability to function in almost all areas (e.g., stays in bed
all day; no job, home, or friends)."  Id.

14

raising on her right leg (A.R. 633).  Dr. Lish referred Plaintiff for MRI and EMG studies and prescribed Norco (A.R. 633).

Plaintiff returned to follow up on her MRI results on April 8, 2010 (A.R. 632).[8]  Dr. Lish stated that Plaintiff's September 2008 microdiscectomy had "resolved" Plaintiff's pain (A.R. 632).  Plaintiff claimed, however, that her right buttock and hip pain increased with sitting more than one hour, that she spent most of her days lying in bed, that she had bilateral hand pain with weakness and an inability to close her hands all the way (A.R. 632).[9]  Plaintiff stated that she had been denied permanent disability benefits (A.R. 632).  Dr. Lish prescribed Xanax, Abilify, and Cymbalta (A.R. 632).

On May 11, 2010, Plaintiff discussed medical marijuana with Dr. Lish (A.R. 631).  Plaintiff was taking Norco for her alleged pain (A.R. 631).  On June 2, 2010, Dr. Lish reported that EMG results from May 28, 2010 showed right carpal tunnel syndrome and left C5-C6 root compression (A.R. 630).  Dr. Lish refilled Plaintiff's Norco (A.R.

///
///
///
///

_____

[8]    The MRI of Plaintiff's lumbar spine from March 26, 2010, showed L5-S1 disc degeneration with disc height loss noted, a 2 mm diffuse and right disc bulge associated with osteophyte ridging, but no significant central canal or nerve root canal stenosis at this level (A.R. 644-45).

[9]    MRI studies of Plaintiff's left and right hands from June 10, 2010, were unremarkable (A.R. 646-49).

1    629).[10]

2

3         On July 7, 2010, Plaintiff reported that her alleged weakness in

4    her hands and alleged pain were "about the same" (A.R. 628).  Dr. Lish

5    refilled Plaintiff's Norco (A.R. 628).

6

7         Later in July, Plaintiff returned, stating that she had been

8    denied permanent disability and was seeking a Norco refill because she

9    supposedly had "loaned" her Norco to a friend (A.R. 627).  Dr. Lish

10   again refilled Plaintiff's Norco (A.R. 627).

11

12        On August 12, 2010, Plaintiff returned to discuss her alleged

13   disability (A.R. 626).  On this occasion, Plaintiff complained of

14   depression, anxiety, back, neck, and right leg pain, and asserted

15   numbness in her hands (A.R. 626).  Dr. Lish's notes indicate that

16   Plaintiff claimed to be unable to sit for more than two hours at a

17   time (A.R. 626).

18   ///

19   ///

20

21        [10]    An MRI of Plaintiff's cervical spine from June 29, 2010
22   showed status post anterior C4 through C6 fusion with focal
     myelomalacia at the C4-5 level and moderate central canal
23   narrowing, and uncovertebral osteophyte and facet atrrhopathy at
     the C5-6 level also with moderate central canal narrowing (A.R.
24   642-43).  At the level above the fusion at C3-4, there was
     diffuse osteophyte complex and facet arthropathy resulting in
25   moderate central canal narrowing with moderate right neural
     foraminal narrowing (A.R 643).  At the area below the fusion,
26   there were right-sided uncovertebral osteophytes, with disc
     osteophyte complex abutting the cord resulting in moderate
27   central canal narrowing with mild left neural foraminal narrowing
     (A.R. 643).
28

1    On October 12, 2010, Plaintiff reportedly was taking up to five

2 Norco per day for alleged hand, shoulder, and back pain (A.R. 558).

3 On December 16, 2010, Plaintiff returned with complaints of back pain

4 and sought to renew her handicap placard (A.R. 557).  Plaintiff

5 reportedly was still having weakness and pain in her hands and

6 dropping things, but her anxiety reportedly was stable on Xanax (A.R.

7 557).  When she returned on January 13, 2011, Plaintiff reported

8 tingling and numbness in her left arm (A.R. 556).  Her alleged chronic

9 pain was described as stable (A.R. 556).

10

11    Plaintiff went on vacation and then came back for a follow up on

12 February 4, 2011 (A.R. 555).  Plaintiff was referred to occupational

13 therapy for her bilateral "hand weakness" and peripheral neuropathy

14 (A.R. 555).  When she returned on March 1, 2011, Plaintiff reported

15 tingling and numbness going down her right leg (A.R. 554).  Plaintiff

16 received a Toradol injection (A.R. 554).

17

18    On May 2, 2011, Plaintiff alleged severe pain in her neck for

19 three days but no recent trauma or injury (A.R. 697).  Allegedly, her

20 hands were both tingling and weak (A.R. 697).  Dr. Lish gave Plaintiff

21 a Toradol injection and noted that Plaintiff would "self-refer" for

22 counseling (A.R. 697).  On June 13, 2011, Plaintiff reported she was

23 taking 150 Norco tablets every 12 days, two at a time (A.R. 696).

24 Later that month, she called asking for stronger pain medication and

25 was given Percocet (A.R. 696).  On July 16, 2011, Dr. Lish prescribed

26 300 Norco tablets (A.R. 689).  On August 15, 2011, Dr. Lish dispensed

27 300 more Norco tablets (A.R. 687).

28 ///

Plaintiff returned to Dr. Lish on September 1, 2011, with complaints of allegedly worsening neck pain and associated headaches (A.R. 686-88). Starting on this date, the format of Dr. Lish's treatment notes changed and included an "active problems" section which mentioned anxiety but not depression (A.R. 674, 677, 680, 683, 686, 690, 692, 703, 706, 710, 715, 733, 735, 738, 742, 745, 767). Plaintiff reportedly was appealing a disability denial (A.R. 686). Plaintiff claimed she had not been using Norco as much as before and supposedly was trying to cut down (A.R. 686). On September 12, 2011, she called, alleging headaches and requesting Percocet instead of Norco (A.R. 692).

On October 18, 2011, Plaintiff alleged worsening anxiety and depression, reportedly because of a family crisis (A.R. 683). She requested a Norco refill, stating that she normally gets 300 Norco tablets per month and last month she only got 220 Norco tablets (A.R. 683). Dr. Lish refilled the 300 Norco tablets as requested but noted that Plaintiff "needs to be changed to a longer acting pain medication and get off Norco" (A.R. 684). Dr. Lish also refilled Plaintiff's Xanax and increased her Abilify (A.R. 684). One week later, Plaintiff sought a refill of Soma, Norco, and Xanax, claiming that her purse had been stolen (again) (A.R. 680). Upon review, Dr. Lish noted that Plaintiff had received small amounts of Norco from her dentist, but had received 740 tablets from two different pharmacies during the month of September 2011 (A.R. 680). Dr. Lish assessed Plaintiff with narcotic pain medication abuse, and referred her to long term pain management and substance abuse counseling (A.R. 681). Dr. Lish reduced Plaintiff's Norco prescription to 112 tablets for two weeks

(A.R. 681).

On November 1, 2011, Plaintiff requested a refill of Xanax, telling Dr. Lish that her purse was stolen (again) so it would be "an early refill" (A.R. 690-91). On November 8, 2011, Plaintiff reported she was "really hurting" and had "been in bed for the past three days" (A.R. 677). Plaintiff also wanted to see a psychiatrist "for low sex drive" (A.R. 677). Dr. Lish referred Plaintiff for further MRI studies and refilled 240 Norco tablets as a "30 day supply" (A.R. 679).

On December 5, 2011, Plaintiff alleged headaches and chronic neck pain (A.R. 674-75). Dr. Lish prescribed 300 Norco tablets and 60 Percocet tablets (A.R. 675).

On January 17, 2012, Plaintiff presented with bronchitis (A.R. 745-46). She returned for followup and reported that a Fentanyl patch was "helpful in reducing overall pain" (A.R. 742). Dr. Lish said he would refer Plaintiff for neurosurgery based on her L4-5 bulging disc, but Plaintiff wanted to wait for further test results (A.R. 744).[11]

On February 9, 2012, Plaintiff reported that she had been in another motor vehicle accident, allegedly causing "considerable" neck pain (A.R. 738). Plaintiff was given a Toradol injection and prescribed Norco (A.R. 740). Later that month, Plaintiff claimed that

---

[11]   MRI studies of Plaintiff's lumbar and cervical spine on January 25, 2012, showed no new findings since previous exams in 2010 (A.R. 755-60).

her neck pain was worsening (A.R. 735).  She was given a Fentanyl
patch and referred to neurosurgery (A.R. 737).

Dr. Lish corresponded with Plaintiff by email on March 12, 2012
(A.R. 728-30, 733).  Plaintiff had requested another Norco refill
(A.R. 730).  Dr. Lish replied, "[A]re you using the [F]entanyl patch?
¶ [I] hope so.  [B]ecause if you are not using it, then [I] am
convinced that you are abusing the [N]orco and don't want to treat
your pain.  ¶ [I]f you are, then we can cut the [N]orco quantity by
50%, maybe more. [Y]ou have been on a ridiculous amount of [N]orco for
too long" (A.R. 730).  Plaintiff denied abusing Norco and claimed she
had stopped using the Fentanyl patch because of an alleged rash (A.R.
729).  Dr. Lish replied, "[I] will note that you had a 'rash' with the
[F]entanyl patch.  [H]owever, [I] find it interesting that you did not
have a rash when you used the patches you got from your roommate
. . ." (A.R. 728 (elipses original)).  Dr. Lish told Plaintiff she
needed to think about what she was trying to achieve, and that records
indicated that she was using 13-14 tablets daily (A.R. 728).  He
continued, "[I] don't have time to continue to monitor your use of
[N]orco.  [I] have already spent 30 minutes going over all of this and
frankly it pisses me off.  [Y]ou have been abusing both the medication
and me.  ¶ [I] will fill for #300 and [I] expect it to last a full 30
days.  [I]f you loose [sic] your rx, if it gets stolen, if your dog
eats it, if it burns in a fire, if you give some of your pills to
someone else (which [I] do not recommend as [I] think it is a felony)
[I] will NOT replace the tablets.  [Y]ou are abusing [N]orco no matter
how much you try to deny it.  [T]his is the last time [I] will warn
you. [I]f you continue to take more than prescribed (and [I] am going

1  to change the rx to specify that you cannot take more than 10 tablets

2  per 24 hours), [I] will have no choice but to report you to the DEA

3  and drop you as a patient. . . .  [Y]ou will always have pain and you

4  will have to find other ways to control your pain.  [Q]uitting smoking

5  will help a lot.  [R]egular exercise.  [C]harting how many pills you

6  take.  [Y]ou should be taking 4-6 tablets per day, NOT 10." (A.R. 728-

7  29).[12]

8

9      On May 8, 2012, Dr. Abou-Samra saw Plaintiff for a neurosurgical

10  consultation (A.R. 722-24).  Plaintiff had been complaining of neck

11  pain (A.R. 722).  Dr. Abou-Samra reviewed cervical and lumbar spine

12  MRI studies, finding no clinically significant abnormalities from the

13  lumbar spine MRI, and some stenosis at the C3-4 level from the

14  cervical spine MRI (A.R. 723).  Dr. Abou-Samra stated that Plaintiff

15  had no weakness in the lower extremities and no sensory abnormalities

16  (A.R. 723).  Dr. Abou-Samra identified no clear pathology to be

17  corrected surgically (A.R. 723).  Dr. Abou-Samra saw Plaintiff again

18  on May 22, 2012, reviewing with Plaintiff her imaging studies (A.R.

19  720-21).  Dr. Abou-Samra thought Plaintiff's pain should be managed

20  with pain management and conservative care; no surgery was indicated

21  (A.R. 720).

22

23      Plaintiff returned to Dr. Lish on June 19, 2012, requesting a

24  medical marijuana letter (A.R. 715-19).  Plaintiff reported having

25  chest pain and shortness of breath for the past two months, and

26  claimed she was under a lot of stress (A.R. 715).  Plaintiff had been

27  _____

28      [12]   There is no evidence in the record that Dr. Lish ever
dropped Plaintiff as a patient or reported her to the DEA.

1  getting 300 Norco tablets every 30 days (A.R. 715).  Dr. Lish ordered

2  a urine toxicology screen to monitor Plaintiff's Norco use and

3  referred Plaintiff for an ECG for her chest pains (A.R. 717).  On

4  July 30, 2012, Plaintiff returned to discuss her lab results (A.R.

5  710-13).  Dr. Lish refilled Plaintiff's Norco again (A.R. 712).  By

6  now, Plaintiff was also using medical marijuana (A.R. 711; see also

7  A.R. 751 (June 19, 2012 testing showing positive results for marijuana

8  metabolite and opiates, namely hydrocodone)).[13]

9

10      On September 17, 2012, Plaintiff claimed that her pain had

11  worsened and that she supposedly had numbness in her hand (A.R. 706).

12  Dr. Lish refilled Plaintiff's Norco again (A.R. 709).  Plaintiff

13  returned on October 9, 2012 to have Dr. Lish complete her disability

14  forms (discussed below) (A.R. 703-05).  On January 25, 2013, Plaintiff

15  returned with a cough (A.R. 767).  Dr. Lish refilled Plaintiff's Norco

16  again (A.R. 769).

17

18      B.   **Other Medical Opinions**

19

20      Psychologist Samantha Case evaluated Plaintiff on January 9, 2011

21  (A.R. 511-14).  Plaintiff complained of depression beginning

22  approximately one year earlier (A.R. 511).  Plaintiff described as

23  mild her symptoms of depressed mood, diminished interest in

24  activities, and fatigue (A.R. 511).  Plaintiff then was taking

25

26  _____

27      [13]   Plaintiff went to three weekly therapy sessions with
    Dr. Heidi Kwan in August 2012 before cancelling the therapy (A.R.
    582-84).  Dr. Kwan diagnosed Plaintiff with depressive disorder,
28  not otherwise specified, and assigned a GAF of 50 (A.R. 583).

Cymbalta, Abilify, and Xanax, prescribed by Dr. Lish (A.R. 511).
Plaintiff claimed that she has difficulty washing her hair and using a
keyboard, and also claimed that doing anything longer than 15 to 20
minutes makes her have to lie down for an hour (A.R. 512).
Plaintiff's posture and gait were normal (A.R. 512).  Dr. Case
indicated Plaintiff "has preoccupations with physical pain" (A.R.
512).

Dr. Case diagnosed Plaintiff with a mood disorder due to her
general medical condition of supposed back pain and assigned a GAF of
70 (A.R. 513).  Dr. Case stated that Plaintiff had mild impairment in
mental health functioning, with a mild level of motivation and follow
through, and mild cognitive limitations (A.R. 513).  Dr. Case believed
that Plaintiff's mental health condition "probably" would abate within
12 months (A.R. 513).  Dr. Case also opined that Plaintiff would be
able to do "1-2 simple and repetitive tasks on a regular basis," with
no impairment in her ability adequately to perform complex tasks or in
her ability to accept instructions from supervisors or to interact
with coworkers and the public (A.R. 514).

On January 22, 2011, Dr. Fariba Vesali examined Plaintiff and
prepared a comprehensive orthopedic evaluation (A.R. 517-21).
Plaintiff complained of pain in both hands, left forearm pain, right
buttock pain with alleged radiation to the right knee, and chronic low
back pain (A.R. 517).  Plaintiff claimed that sitting or standing more
than 10 minutes at a time aggravates her low back pain, which subsides
when she lies down (A.R. 518).  Plaintiff's only admitted daily
activity was doing laundry (A.R. 518).  She said she stopped working

due to hand and low back pain (A.R. 518).  Plaintiff was taking Norco,
Xanax, Gabapentin, Cymbalta, Abilify, Prilosec, B12, and prescription
cannibus (A.R. 518).  On examination, Plaintiff was observed to have
no difficulties getting on and off the examining table, taking off her
shoes, and untying and tying her right shoe (A.R. 518).  Plaintiff had
a normal gait and was able to walk on toes and heels, although she had
claimed that walking on her toes and heels aggravated her alleged low
back pain (A.R. 519).  Plaintiff was not using any assistive device
for ambulation (A.R. 519).

Dr. Vesali diagnosed mild right carpal tunnel syndrome, chronic
low back pain, status post back surgery, with possible right
sacroiliac joint dysfunction (A.R. 520).  Dr. Vesali did not believe
that Plaintiff's condition would impose any limitations for 12
continuous months, and opined that Plaintiff could walk, stand, and
sit six hours in an eight-hour day with normal breaks, and would have
no limitations in lifting, carrying, posture, manipulation, or
environment, and no need for an assistive device for ambulation (A.R.
520).

State agency review physician Dr. G. Ikawa completed a
Psychiatric Review Technique form and related analysis dated
February 22, 2011 (A.R. 524-37).  Dr. Ikawa found that Plaintiff would
have only mild restriction in activities of daily living and in
maintaining concentration, persistence, or pace (A.R. 532).  Dr. Ikawa
agreed that Dr. Case's opinion was supported by the evidence, and
found Plaintiff's psychiatric condition "non-severe" (A.R. 536-37).
///

1      State agency review physician Dr. I. Ocrant completed a Physical

2   Residual Functional Capacity Assessment form dated February 23, 2011

3   (A.R. 538-42).  Dr. Ocrant found Plaintiff capable of performing

4   medium work (i.e., occasionally lifting and/or carrying 50 pounds,

5   frequently lifting and/or carrying 25 pounds, standing or walking six

6   hours in an eight-hour day, sitting six hours in an eight-hour day,

7   with limited pushing and pulling in the upper extremities and

8   occasional overhead activities (A.R. 539).  Plaintiff could frequently

9   climb ramps and stairs, balance, kneel, and crawl, and occasionally

10  climb ladders, ropes, or scaffolds, stoop, and crouch (A.R. 540).  Dr.

11  Ocrant found Dr. Vesali's opinion not supportable, given Plaintiff's

12  alleged heart, neck, and back issues (A.R. 542).

13

14      In a June 20, 2011 Disability Determination Explanation, two

15  other state agency review physicians looked at the available record

16  and confirmed the prior findings that Plaintiff's alleged mental

17  condition is non-severe, and that she does not suffer from a disabling

18  physical condition (A.R. 109-19).  These doctors gave "great weight"

19  to the consultative examiners' opinions (A.R. 118).[14]

20  ///

21  ///

22  ///

23  ///

24

---

25      [14]    In a Case Analysis form dated February 23, 2010, other
26  state agency review physicians found Plaintiff capable of
    performing light work with some postural limitations and simple
27  repetitive tasks with limited public contact, stating that opiate
    dependence was a contributing factor to Plaintiff's mental and
28  physical problems (A.R. 426-29).

**II.   Substantial Evidence Supports the Conclusion Plaintiff Can Work.**

The Administrative Record contains relevant non-medical and medical evidence that "a reasonable mind might accept as adequate to support [the] conclusion" that Plaintiff is not disabled from all employment.

First, with respect to Plaintiff's alleged mental impairments, the ALJ properly relied on Dr. Case's opinion that Plaintiff's mental impairments were non-severe. See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (consultative examiner's opinion based on independent examination of the claimant constitutes substantial evidence). Dr. Ikawa's concurring, non-examining state agency physician opinion also lends support to the ALJ's findings. See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (where the opinions of non-examining physicians do not contradict "all other evidence in the record" an ALJ properly may rely on these opinions); Curry v. Sullivan, 925 F.2d 1127, 1130 n.2 (9th Cir. 1990). An ALJ may not rely solely on the opinions of non-examining physicians. See, e.g., Lester v. Chater, 81 F.3d 821, 831 (9th Cir. 1995); Erickson v. Shalala, 9 F.3d 813, 818 n.7 (9th Cir. 1993). Reliance was not sole in the present case, since the ALJ gave "great weight" to both the examining and non-examining opinions (A.R. 26-27).

Second, with respect to Plaintiff's alleged physical impairments, the ALJ properly relied on the state agency physicians to find Plaintiff capable of performing light work with some postural limitations (A.R. 28). See Andrews v. Shalala, 53 F.3d at 1041; Curry

v. Sullivan, 925 F.2d at 1130 n.2.  As summarized above, the original State agency physicians found Plaintiff capable of performing light work with some postural limitations, and the other state agency physicians more recently found Plaintiff capable of performing medium work with lesser postural limitations than the ALJ found to exist. Compare A.R. 426-29 and A.R. 538-42 with A.R. 28.  Dr. Vesali examined Plaintiff and found Plaintiff capable of performing work at all exertion levels with no limitations – believing that Plaintiff's problems would abate within 12 months (A.R. 517-21).  The ALJ properly placed "significant" weight on the most restrictive of the non-examining opinions, and "little" weight on the less restrictive examining and non-examining opinions, based on the ALJ's consideration of the entire objective record and Plaintiff's subjective complaints (A.R. 32-33).[15]  As the ALJ did not rely solely on non-examining opinions in reaching her decision, the ALJ's decision was proper.

The vocational expert testified that a person with the residual functional capacity the ALJ found to exist could perform Plaintiff's past relevant work or unskilled light work as a parking attendant or

---

[15]    As discussed more fully below, Plaintiff testified that she has problems with grasping and holding objects, but not with fine manipulation, and with turning her head while driving a car (A.R. 62-63).  Dr. Lish opined that for 20 percent of a workday, Plaintiff could use her hands to grasp, turn or twist objects, use her fingers for fine manipulations, and use her arms for reaching (including overhead) (A.R. 578).  Consistent with Dr. Lish's opinion, the ALJ limited Plaintiff to occasional overhead reaching, no constant fine or gross manipulation, and no power gripping, grasping, or torquing bilaterally (A.R. 28).  In Social Security terminology, "occasional" means "occurring from very little up to one-third of the time."  See Social Security Ruling 83-10, 1983 WL 31251 at *5.

storage facility rental clerk (A.R. 71-72).  The vocational expert's testimony furnishes substantial evidence there exist significant numbers of jobs Plaintiff can perform.  See Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988); see also Barker v. Secretary, 882 F.2d 1474, 1478-80 (9th Cir. 1989); Martinez v. Heckler, 807 F.2d 771, 775 (9th Cir. 1986); see generally Johnson v. Shalala, 60 F.3d 1428, 1435-36 (9th Cir. 1995) (ALJ properly may rely on vocational expert to identify jobs claimant can perform); 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520, 416.920.


To the extent the record contains conflicting evidence, it was the prerogative of the ALJ to resolve the conflicts.  See Lewis v. Apfel, 236 F.3d 503, 509 (9th Cir. 2001).  Where, as here, the evidence "is susceptible to more than one rational interpretation," the Court must uphold the administrative decision.  Andrews v. Shalala, 53 F.3d at 1039-40; accord Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002); Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997); see also Morgan v. Commissioner, 169 F.3d 595, 601 (9th Cir. 1999) (where medical reports are inconclusive, the resolution of conflicts in the evidence is the province of the Commissioner).[16]

---

[16]   Plaintiff's claim that the ALJ erred in failing to find Plaintiff's alleged depression and anxiety, headaches, and carpal tunnel syndrome severe, and to include limitations based on such conditions in the ALJ's residual functional capacity determination and hypothetical questioning of the vocational expert (Plaintiff's Motion, pp. 6-9), does not provide a basis for the Court to disturb the administrative decision. Hypothetical questions posed to a vocational expert need only include the limitations the ALJ finds to exist. See, e.g., Bayliss v. Barnhart, 427 F.3d 1211, 1217-18 (9th Cir. 2005); Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).  The ALJ
(continued...)

1   **III.  <u>The ALJ Did Not Materially Err in Discounting Dr. Lish's</u>**

2        **<u>Opinions</u>.**

3

4        Plaintiff contends that the ALJ improperly discounted Dr. Lish's

5   opinions.  <u>See</u> Plaintiff's Motion, pp. 1-5.  Dr. Lish completed a

6   Medical Source Statement (Mental) form for Plaintiff dated October 9,

7   2012 (A.R. 573).  Dr. Lish listed Plaintiff's diagnoses as chronic

8   neck and back pain, coronary artery disease, right carpal tunnel

9   syndrome, sciatica, peripheral neuropathy, depression, and anxiety

10  (A.R. 573).  Dr. Lish also opined that Plaintiff would be "markedly

11  limited" in her ability to relate and interact with coworkers and

12  supervisors, to deal with the public, to understand, remember and

13  carry out complex job instructions, to maintain concentration and

14  attention for at least two hour increments, and to withstand the

15  stress and pressures of an eight-hour work day and day-to-day activity

16  (A.R. 573).  Dr. Lish opined that Plaintiff would be "mildly limited"

17  _____

18        [16](...continued)
    relied on substantial evidence in finding that these alleged

19  conditions did not entail significant limitations, and included
    all the significant limitations the ALJ found to exist in the

20  residual functional capacity determination and in the
    hypothetical questioning.  Moreover, even if the ALJ erred in

21  failing to find certain of Plaintiff's alleged problems "severe,"
    any such error was harmless.  <u>See</u> Social Security Ruling 96-8p

22  ("In assessing RFC, the adjudicator must consider limitations and
    restrictions imposed by all of an individual's impairments, even

23  those that are not 'severe'"); <u>Burch v. Barnhart</u>, 400 F.3d 676,
    682-83 (9th Cir. 2005) (error in failing to find an impairment

24  severe did not prejudice the claimant where the Administration
    found other impairments severe and considered the effects of the

25  non-severe impairment when analyzing residual functional
    capacity); <u>see generally</u> <u>McLeod v. Astrue</u>, 640 F.3d 881, 886-89

26  (9th Cir. 2011) (claimant bears the burden of showing a
    substantial likelihood of prejudice from the Administration's

27  errors).

28

in her ability to understand, remember, and carry out simple or one-
or-two step job instructions, and to handle funds (A.R. 573).  Dr.
Lish claimed that drug addiction had not significantly contributed to
Plaintiff's limitations, which were said to have existed for three
years (i.e., since October 2009) (A.R. 573).  Dr. Lish did not explain
the bases for his opinions (A.R. 573).

        Dr. Lish also completed a Physical Residual Functional Capacity
Questionnaire form dated October 9, 2012 (A.R. 575-79).  Dr. Lish
opined that Plaintiff had chronic neck and back pain with
tingling/numbness in her legs and arms, depressed and anxious mood,
and weakness in her hands and legs (A.R. 575).  He claimed Plaintiff's
pain was 7-8 on a 10-point scale daily, with sharp stabbing pain in
the neck and low back (A.R. 575).  According to Dr. Lish, narcotic
pain medications cause Plaintiff to be drowsy, dizzy, and cloud her
thoughts (A.R. 575).  Walking, sitting, and standing supposedly
increased Plaintiff's pain (A.R. 575).  The clinical findings and
objective findings assertedly supporting Plaintiff's pain were stated
to be a bulging disc at L3-4 compressing the nerve root, as well as
Plaintiff's claimed inability to stand on the balls of her feet (A.R.
575).  Dr. Lish opined that Plaintiff would frequently or constantly
have interference with her attention and concentration to perform even
simple work tasks, and would be incapable of even a low stress job due
to her need for narcotic pain medications (A.R. 576).  Dr. Lish opined
that Plaintiff could walk up to one block, could sit 15 minutes, and
could stand 15 minutes at one time (A.R. 576).  According to Dr. Lish,
Plaintiff could sit and stand or walk less than two hours in an eight-
hour workday (A.R. 577).  Dr. Lish further opined that Plaintiff would

have to walk around every 30 minutes for five to six minutes at a time, would have to shift positions at will, would have to take unscheduled breaks once or twice an hour for 10 to 20 minutes, could rarely lift less than 10 pounds, and could rarely look down or up, but could occasionally turn her head right or left or hold her head in a static position (A.R. 577-78).  According to Dr. Lish, Plaintiff could rarely twist, stoop/bend, crouch/squat, and climb stairs, and could never climb ladders (A.R. 578).  Dr. Lish opined that, for 20 percent of an eight-hour workday, Plaintiff could use her hands to grasp, turn or twist objects, use her fingers for fine manipulations, and use her arms for reaching (including overhead reaching) (A.R. 578).  Dr. Lish opined that Plaintiff would miss more than four days of work per month (A.R. 578).  Dr. Lish claimed that Plaintiff's limitations had existed since October of 2009 (A.R. 579).

A treating physician's conclusions "must be given substantial weight."  Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988); see Rodriguez v. Bowen, 876 F.2d 759, 762 (9th Cir. 1989) ("the ALJ must give sufficient weight to the subjective aspects of a doctor's opinion. . . .  This is especially true when the opinion is that of a treating physician") (citation omitted); see also Orn v. Astrue, 495 F.3d 625, 631-33 (9th Cir. 2007) (discussing deference owed to treating physician opinions).  Even where the treating physician's opinions are contradicted,[17] "if the ALJ wishes to disregard the

---

[17]    Rejection of an uncontradicted opinion of a treating physician requires a statement of "clear and convincing" reasons.  Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Gallant v. Heckler, 753 F.2d 1450, 1454 (9th Cir. 1984).

opinion[s] of the treating physician he . . . must make findings
setting forth specific, legitimate reasons for doing so that are based
on substantial evidence in the record." Winans v. Bowen, 853 F.2d
643, 647 (9th Cir. 1987) (citation, quotations and brackets omitted);
see Rodriguez v. Bowen, 876 F.2d at 762 ("The ALJ may disregard the
treating physician's opinion, but only by setting forth specific,
legitimate reasons for doing so, and this decision must itself be
based on substantial evidence") (citation and quotations omitted).
Contrary to Plaintiff's arguments, the ALJ stated sufficient reasons
for discounting Dr. Lish's opinions.

The ALJ rejected Dr. Lish's opinions that Plaintiff would have
greater limitations than the ALJ found to exist, finding the opinions
not supported by the entire medical record or Dr. Lish's own treatment
notes, and contrary to Plaintiff's ability to perform daily activities
(A.R. 26, 32).[18]  Specifically, the ALJ gave "little weight" to Dr.
Lish's opinion that Plaintiff would have marked limitations in her
ability to relate and interact with supervisors, coworkers, and the
public, to understand, remember and carry out technical or complex job

---

[18]   Defendant argues, inter alia, that the ALJ properly
relied on the medical expert opinions because the medical experts
were specialists in their fields, unlike Dr. Lish who is a
general practitioner (Defendant's Motion, p. 3).  The Court
cannot affirm the administrative decision on the basis of this
argument.  See Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir.
2001) (court "cannot affirm the decision of an agency on a ground
that the agency did not invoke in making its decision").  While
the ALJ generally referred to an expert's degree of
specialization as a factor to consider in assigning weight to
medical source opinions, the ALJ did not indicate specifically
that the specialization factor was a basis for relying on the
experts' opinions or for discounting Dr. Lish's opinions (A.R.
27).

instructions, and in her ability to withstand the stress and pressures
associated with an eight hour workday and day-to-day work activities
(A.R. 26).  The ALJ explained:


> [Plaintiff] was limited to routine and conservative
> prescription medications; she had one instance of alleged
> hospitalization due to consumption of Norco, but she
> experienced no significant withdrawals [which] suggested her
> consumption was lower than alleged; Dr. Lish stated
> [Plaintiff] had no limitations from drug addiction; and she
> was capable of performing activities of daily living,
> interacting with others, and providing personal care as
> noted herein.

(A.R. 26).


The ALJ also gave "little weight" to Dr. Lish's opinions that:
(1) Plaintiff's pain would interfere with the attention and
concentration needed to perform even simple tasks; (2) Plaintiff would
be incapable of even low stress jobs; (3) Plaintiff could sit, stand,
and/or walk for less than two hours per workday; (4) Plaintiff could
lift and/or carry less than 10 pounds rarely; (5) Plaintiff could
rarely look down or up, occasionally turn her head right or left, and
hold her head in a static position, rarely perform postural
activities, and never climb ladders; and (6) Plaintiff would miss more
than four days of work per month (A.R. 32).  The ALJ explained that
Plaintiff's recent diagnostic images did not support the severity of
Plaintiff's alleged pain, her condition was being maintained with

medication management, and she could perform activities of daily
living, social interaction, and personal care (A.R. 32).

These stated reasons suffice under the applicable case law.  An
ALJ properly may discount a treating physician's opinions that are in
conflict with treatment records or are unsupported by objective
clinical findings.  See Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th
Cir. 2005) (conflict between treating physician's assessment and
clinical notes justifies rejection of assessment); Batson v.
Commissioner, 359 F.3d 1190, 1195 (9th Cir. 2004) ("an ALJ may
discredit treating physicians' opinions that are conclusory, brief,
and unsupported by the record as a whole . . . or by objective medical
findings"); Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003)
(treating physician's opinion properly rejected where physician's
treatment notes "provide no basis for the functional restrictions he
opined should be imposed on [the claimant]"); see also Rollins v.
Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ properly may reject
treating physician's opinions that "were so extreme as to be
implausible and were not supported by any findings made by any doctor
. . ."); 20 C.F.R. §§ 404.1527(d), 416.927(d) (factors to consider in
weighing treating source opinion include the supportability of the
opinion by medical signs and laboratory findings as well as the
opinion's consistency with the record as a whole).

Here, the ALJ correctly observed that Dr. Lish's conclusory
opinions lack support in the treatment records, including Dr. Lish's
own records and findings.  See A.R. 26-27, 30-33 (ALJ discussing
medical record).  Although Dr. Lish indicated that Plaintiff had

weakness in her hands and legs (A.R. 575), on examination Plaintiff had a normal gait, motor strength of 5/5, and normal muscle bulk and tone in her bilateral upper and lower extremities.  <u>See</u> A.R. 512, 519-20.  An emergency room treatment note from May 2010, reflects that Plaintiff reported she had "excellent exercise tolerance" (A.R. 483). In December 2010, Dr. Lish reported that Plaintiff's anxiety was stable on Xanax (A.R. 557).  In January 2011, Plaintiff's alleged chronic pain and neuropathy reportedly were stable (A.R. 556).  Upon referral in May of 2012 to Dr. Abou-Samra for a neurosurgical consult, Dr. Abou-Samra found no clinically significant abnormalities from the lumbar spine MRI and some stenosis from the cervical spine MRI, but no lower extremity weakness or sensory abnormalities, and no pathology to be corrected surgically (A.R. 720-24).  Dr. Abou-Samra advised Dr. Lish that Plaintiff's pain could be managed with pain management and conservative care (A.R. 720).[19]  After such time, Dr. Lish maintained Plaintiff on Cymbalta, Abilify, Xanax (Alprazolam), and Norco, without any "significant" drug-addiction related limitations (A.R. 51, 55, 573, 704-05, 707, 709, 711-12, 715-19, 767-69).  The ALJ properly considered the lack of support from the medical record as a whole for the extreme and largely unexplained limitations Dr. Lish assigned.

A material inconsistency between a treating physician's opinion and a claimant's admitted level of daily activities also can furnish a specific, legitimate reason for rejecting a treating physician's opinion.  <u>See, e.g.</u>, <u>Rollins v. Massanari</u>, 261 F.3d at 856.  Contrary

_____

[19]    Dr. Abou-Samra previously had released Plaintiff to return to full time work without any restrictions (A.R. 294; <u>see also</u> A.R. 328).

to Dr. Lish's opinion that since at least October of 2009 Plaintiff has had marked limitations in her ability to interact with others, carry out complex instructions, and handle work-related stress, Plaintiff and her friend admitted in September of 2010 that Plaintiff could follow written and spoken instructions, could handle changes in routine, and that her condition caused no problems with her memory, understanding, following instructions, or getting along with others. See A.R. 227-28, 236-37.  Despite Dr. Lish's opinion that Plaintiff could sit, stand, and/or walk for less than two hours total in an eight hour day (A.R. 577), Plaintiff and her friend admitted in September 2010 that Plaintiff's condition did not affect her sitting. See A.R. 227, 236.  In discounting Dr. Lish's opinions, the ALJ properly considered the apparent inconsistencies between those opinions and Plaintiff's admitted daily activities.

     For these reasons, the ALJ did not materially err in discounting Dr. Lish's opinions.

**IV.  The ALJ Did Not Materially Err in Discounting Plaintiff's Credibility and the Lay Witness Evidence.**

     Plaintiff also contends that the ALJ erred in finding Plaintiff's subjective complaints less than fully credible and in rejecting similar statements by Plaintiff's friend.  See Plaintiff's Motion, pp. 9-10.

     An ALJ's assessment of a claimant's credibility is entitled to "great weight."  Anderson v. Sullivan, 914 F.2d 1121, 1124 (9th Cir.

1  1990); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985).  Where, as

2  here, the ALJ finds that the claimant's medically determinable

3  impairments reasonably could be expected to cause the alleged symptoms

4  of which the claimant subjectively complains (A.R. 30), any

5  discounting of the claimant's complaints must be supported by

6  specific, cogent findings.  See Berry v. Astrue, 622 F.3d 1228, 1234

7  (9th Cir. 2010); Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995);

8  but see Smolen v. Chater, 80 F.3d 1273, 1282-84 (9th Cir. 1996)

9  (indicating that ALJ must offer "specific, clear and convincing"

10 reasons to reject a claimant's testimony where there is no evidence of

11 malingering).[20]  An ALJ's credibility findings "must be sufficiently

12 specific to allow a reviewing court to conclude the ALJ rejected the

13 claimant's testimony on permissible grounds and did not arbitrarily

14 discredit the claimant's testimony."  See Moisa v. Barnhart, 367 F.3d

15 882, 885 (9th Cir. 2004) (internal citations and quotations omitted);

16 see also Social Security Ruling 96-7p.  As discussed below, the ALJ

17 stated sufficient reasons for deeming Plaintiff's subjective

18 complaints less than fully credible.

19 ///

20 ///

21

22 ———————————

23    [20]    In the absence of an ALJ's reliance on evidence of
   "malingering," most recent Ninth Circuit cases have applied the

24 "clear and convincing" standard.  See, e.g., Burrell v. Colvin,
   775 F.3d 1133, 1136-37 (9th Cir. 2014); Chaudhry v. Astrue, 688

25 F.3d 661, 670, 672 n.10 (9th Cir. 2012); Molina v. Astrue, 674
   F.3d 1104, 1112 (9th Cir. 2012); Taylor v. Commissioner, 659 F.3d

26 1228, 1234 (9th Cir. 2011); see also Ballard v. Apfel, 2000 WL
   1899797, at *2 n.1 (C.D. Cal. Dec. 19, 2000) (collecting earlier

27 cases).  In the present case, the ALJ's findings are sufficient
   under either standard, so the distinction between the two

28 standards (if any) is academic.

Plaintiff testified that she stopped working in September of 2007 when she had back surgery (A.R. 45).  Plaintiff said she became addicted to Norco (A.R. 46).  At the time of the hearing, Plaintiff reportedly was taking six to 10 Norco per day (A.R. 51).  Plaintiff had neck surgery in February 2008 (A.R. 59).  Plaintiff said she tried to return to work briefly in September of 2008, but was laid off and she otherwise claimed she could not work due to the alleged side effects of the medications she was taking (A.R. 46-47, 58-59, 65-67).  Plaintiff said she had been taking three Xanax per day and by the time of the hearing had cut it down to once every few days, and took Gabapentin three times per day (A.R. 66).

Plaintiff also testified that she could not work at the time of the hearing because of burning and swelling in her hands and arms (neuropathy), shooting pain in her legs, and back and neck pain (A.R. 48-49, 54).  Plaintiff said that, on an average day, her pain is five on a scale of zero to 10 (A.R. 50).  On a bad day, her pain supposedly goes to nine (A.R. 50).  She claimed she has an average of three bad days each week, during which she supposedly spends most of the day on her couch (A.R. 50, 57).

Plaintiff said on an average day she lies on the couch and watches television (A.R. 48).  She reportedly gets up, brushes her teeth, tries to do a load of laundry, and tries to clean the parts of the bathroom that she can clean without bending over (A.R. 49, 52-53).  Plaintiff testified she thought she could sit for 10 to 15 minutes before having to move, could stand for five to 10 minutes, and could lift a couple pounds at most (A.R. 51-52, 60).  Plaintiff said she has

trouble writing with a pen after about five minutes and trouble using
a keyboard after about 10 minutes, supposedly due to pain (A.R.
61-62).  Plaintiff reportedly did not have problems with fine
fingering; her problems allegedly were with grasping and holding (A.R.
62).  Plaintiff said she did no grocery shopping (A.R. 52).  Plaintiff
twice had her husband help her wash her hair because she supposedly
could not lift her arms (A.R. 53).  Plaintiff said she was having a
hard time turning her head when driving a car but could look up and
down (A.R. 63).  She said that once every six weeks, she has a bad
headache that makes her have to lie down for an hour (A.R. 63-64).
Plaintiff testified she can focus her attention for about an hour
(A.R. 68).

Plaintiff had a heart stent placement in 2000 (A.R. 64).  She
said that, when she is stressed, she has chest pains (A.R. 64).
Plaintiff said she smokes a half pack of cigarettes per day (A.R. 54).
Plaintiff said she had been treated for depression with weekly therapy
for six weeks, but claimed she had to stop because her insurance
stopped paying (A.R. 54-55).  Plaintiff said she was taking Xanax,
Cymbalta, and Abilify for her depression, which Dr. Lish had
prescribed (A.R. 55).

In a Function Report – Adult – Third Party form dated
September 30, 2010, Plaintiff's friend Yvonne Pulido reported that she
saw Plaintiff approximately two hours per day, two to three times per
week (A.R. 222).  Pulido stated that Plaintiff struggles to get up in
the morning due to allegedly severe muscle pain, and once she is up
Plaintiff attempts to pick up the house, watches television, reads,

goes on the Internet, does some laundry, and picks up her daughter
from school, with rest between all of these activities (A.R. 222).
According to Pulido, Plaintiff could slowly bathe and carefully dress
herself but did not shave (A.R. 223).   Pulido stated Plaintiff had
anxiety and trouble sleeping due to her pain (A.R. 223).   Plaintiff's
daughter reportedly did most of the cooking, with Plaintiff only
making microwave dinners every once in a while (A.R. 224).   Plaintiff
did no house or yard work, supposedly due to her pain (A.R. 224).
Pulido said that Plaintiff "feels down most of the time" (A.R. 224).
Pulido said that Plaintiff could go out alone every day in a car but
only for a limited time (A.R. 225).   Pulido also said that Plaintiff
could grocery shop when she has to (i.e., once a month for 20 minutes)
but that Plaintiff's husband does most of the food shopping (A.R.
225).   Pulido said Plaintiff talked with others on the phone or by
email 4-5 times per day, but was not as social as she once was (A.R.
226-27).   Pulido indicated that Plaintiff could follow instructions
"pretty good" (A.R. 227) and get along with authority figures "very
well" (A.R. 228).   Somewhat inconsistently, Pulido also claimed that
Plaintiff had become depressed, sad, "anti-social" and "hard to be
around" (A.R. 229).

     In her own Function Report - Adult form dated September 30, 2010,
Plaintiff reported that on a good day she gets up, dresses, attempts
to do "very little" housework, rests frequently, takes her daughter to
and from school, and tries to socialize with a friend (A.R. 231).   On
worse days, she reportedly stays on the couch, watches television, and
sleeps (A.R. 231).   Plaintiff also reported that she will make a
microwave meal once in a while and does some laundry twice a week

(A.R. 233).  Plaintiff stated she goes outside daily and could drive a car, but not for long distances (A.R. 234).  She also stated she could grocery shop with the help of family or friends once or twice a month (A.R. 234).[21]

The ALJ deemed Plaintiff's testimony less than fully credible based on: (1) the inconsistency between the objective medical evidence and Plaintiff's allegations; and (2) Plaintiff's daily activities, which the ALJ found were inconsistent with the presence of an incapacitating or debilitating condition (A.R. 28-29).  More specifically, the ALJ found that Plaintiff's allegations concerning isolation due to depression were inconsistent with her report that she spent time with others, daily if possible, talking on the phone, could get along with others, and could go places "when it is a must" (A.R. 29).  Although Plaintiff alleged that she had problems with memory and concentration, she reported that she could pay attention depending on the situation, could follow instructions, and was fine with handling changes in routine (A.R. 29).  Although Plaintiff complained about alleged pain-related limitations, including an alleged inability to grocery shop or lift more than two pounds, she admitted that she could do very light chores including laundry and also admitted that she could go out alone, drive a car, and shop in stores with the help of family or friends (A.R. 28-29).  While Plaintiff complained that she supposedly could not sit for more than 10 or 15 minutes at a time, she

---

[21]   In a Disability Report - Appeal form dated May 6, 2011, Plaintiff claimed that her neck had gotten worse, causing her hands and arms to become numb as of March of 2011 (A.R. 257, 260).  She also claimed headaches and anxiety (A.R. 257).

sat for approximately 40 minutes through the hearing without issue
(A.R. 29).  Plaintiff admitted that she could attend to her personal
care, prepare simple meals, do light housework, go outside every day,
take her daughter to and from school, socialize, and watch television
– activities the ALJ said required some of the same physical and
mental abilities as those required to obtain and maintain employment
(A.R. 28-29).  The ALJ also found that Plaintiff's noncompliance with
quitting smoking and with other recommended treatment suggested that
Plaintiff's symptoms were not as severe as she reported (A.R. 31-32).

        The ALJ's generalized, conclusory statement that the medical
evidence of record does not support Plaintiff's allegations is not, in
itself, a sufficiently specific reason for rejecting Plaintiff's
credibility.  See Moisa v. Barnhart, 367 F.3d at 885.  As for
Plaintiff's alleged level of daily activities, it is difficult to
reconcile particular Ninth Circuit decisions upholding and striking
down ALJs' rejections of claimants' credibility in reliance on the
claimants' daily activities.  Compare Burch v. Barnhart, 400 F.3d 676,
680 (9th Cir. 2005) with Vertigan v. Halter, 260 F.3d 1044, 1049-50
(9th Cir. 2001) and Gallant v. Heckler, 753 F.2d 1450, 1453-55 (9th
Cir. 1984).  Assuming arguendo that the ALJ's partial reliance on this
consideration also was improper, the ALJ's credibility determination
nevertheless would stand.  The ALJ's remaining reasons are legally
sufficient.  See Carmickle v. Commissioner, 533 F.3d 1155, 1163 (9th
Cir. 2008) (the infirmity of one or two supporting reasons for an
ALJ's credibility determination does not require overturning the
determination if independently valid supporting reasons remain).
///

1    First, Plaintiff's noncompliance with her recommended treatments

2  is a specific reason supported by substantial evidence to find

3  Plaintiff not credible.  See Koepke v. Commissioner of Social Sec.

4  Admin., 490 Fed. App'x 864, 866 (9th Cir. 2012) (finding cited

5  noncompliance with and abuse of narcotic prescriptions, discharge from

6  separate medical practices, and claimant's reports of losing narcotic

7  prescriptions was a specific reason for rejecting claimant's

8  credibility); see generally Fair v. Bowen, 885 F.2d 597, 603 (9th Cir.

9  1989) (unexplained or inadequately explained failure to seek or follow

10 prescribed course of treatment can cast doubt on claimant's

11 credibility); Social Security Ruling 96-7p (claimant may be less

12 credible where record shows individual is not following the treatment

13 as prescribed and there are no good reasons for this failure).

14

15    Second, the ALJ properly could rely on inconsistencies in

16 Plaintiff's statements in finding Plaintiff not credible.  The

17 internal contradictions between Plaintiff's testimony and her admitted

18 activities furnish specific reasons supported by substantial evidence

19 for discounting Plaintiff's credibility.  See Burch v. Barnhart, 400

20 F.3d at 680 ("In determining credibility, an ALJ may engage in

21 ordinary techniques of credibility evaluation, such as considering

22 . . . inconsistencies in claimant's testimony."); Batson v.

23 Commissioner of Social Security Administration, 359 F.3d 1190, 1196

24 (9th Cir. 2004) (where ALJ considered claimant's testimony to be

25 contradictory and unsupported by either the objective medical evidence

26 or any persuasive reports of his doctors, the district court did not

27 err in affirming the ALJ's adverse credibility finding) (citing Light

28 v. Social Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997) ("To find the

1    claimant not credible the ALJ [may] rely . . . on internal

2    contradictions in that testimony.").

3

4         In sum, the ALJ stated sufficient reasons to allow this Court to

5    conclude that the ALJ discounted Plaintiff's credibility on

6    permissible grounds.  See Moisa v. Barnhart, 367 F.3d at 885.  The

7    Court therefore defers to the ALJ's credibility determination.  See

8    Lasich v. Astrue, 252 Fed. App'x 823, 825 (9th Cir. 2007) (court will

9    defer to ALJ's credibility determination when the proper process is

10   used and proper reasons for the decision are provided); accord Flaten

11   v. Secretary of Health & Human Services, 44 F.3d 1453, 1464 (9th Cir.

12   1995).

13

14        Similarly, the Court defers to the ALJ's finding that Pulido's

15   report was credible only to the extent consistent with the residual

16   functional capacity the ALJ found to exist (A.R. 30).  The ALJ stated

17   that Pulido's opinion concerning Plaintiff's ability to work was not

18   as persuasive as the professional opinions, that Pulido was motivated

19   by her relationship with Plaintiff and her opinion was not an unbiased

20   one, and finally that, like Plaintiff's statements (which the ALJ

21   noted were similar to Pulido's statements), Pulido's statements were

22   not supported by the clinical or diagnostic medical evidence as

23   discussed elsewhere in the ALJ's decision (A.R. 30).

24

25        An ALJ may discount lay witness testimony where the testimony is

26   similar to the claimant's testimony and the ALJ has given legally

27   sufficient reasons for discounting the claimant's testimony.  See

28   Valentine v. Commissioner Social Sec. Admin., 574 F.3d 685, 694 (9th

Cir. 2009) ("In light of our conclusion that the ALJ provided clear and convincing reasons for rejecting Valentine's own subjective complaints, and because Ms. Valentine's testimony was similar to such complaints, it follows that the ALJ gave germane reasons for rejecting her testimony."); see generally Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996) ("[T]he ALJ can reject the testimony of lay witnesses only if he gives reasons germane to each witness whose testimony he rejects."). Because the ALJ's discounting of Plaintiff's testimony was proper, the ALJ's discounting of Pulido's similar statements was also proper.[22]

///

///

///

///

///

///

///

///

---

[22] The Court observes, however, that a lay witness' possible personal interest is not a sufficient reason for rejecting lay testimony. The Ninth Circuit consistently has held that bias cannot be presumed from a familial or personal relationship. See, e.g., Regennitter v. Commissioner, 166 F.3d 1294, 1298 (9th Cir. 1999); Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Likewise, the ALJ's observation that Pulido is not a medical professional and therefore her opinion was not as persuasive as those of the medical professionals is not an adequate reason for discrediting Pulido's statements. See Bruce v. Astrue, 557 F.3d 1113, 1116 & n.1 (9th Cir. 2009) (overturning ALJ's rejection of lay witness testimony where the ALJ reasoned, in part, that the witness "is not knowledgeable in the medical and/or vocational fields" and her statements were "not supported by the objective medical evidence"); see also Williams v. Astrue, 493 Fed. App'x 866, 869 (9th Cir. 2012) (reaffirming same).

45

1                                 **CONCLUSION**

2

3        For all of the foregoing reasons,[23] Plaintiff's motion for

4 summary judgment is denied and Defendant's motion for summary judgment

5 is granted.

6

7        LET JUDGMENT BE ENTERED ACCORDINGLY.

8

9        DATED: March 18, 2015.

10

11                     _____/S/_____

                           CHARLES F. EICK

12                   UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23 _____

24      [23]    The Court has considered and rejected each of

25 Plaintiff's arguments, although the Court has discussed only
Plaintiff's principal arguments herein.  Neither Plaintiff's

26 arguments nor the circumstances of this case show any
"substantial likelihood of prejudice" resulting from any error

27 allegedly committed by the Administration.  See generally McLeod

28 v. Astrue, 640 F.3d 881, 887-88 (9th Cir. 2011) (discussing the
standards applicable to evaluating prejudice).